THOMPSON et al. *v.* CHRETIEN et al.

B, who was a surety for A., a collector of taxes due to the United States, having executed a
note, secured by mortgage, for the payment of an amount due by A. to the United States
for taxes, the latter conveyed to B. all his property, of every description, authorizing him
to hold or dispose of the same until the debt and incidental expenses should be paid.
Some litigation having grown out of this conveyance, the parties terminated their disputes
by a compromise, by which a part of the property was given back to A., and B. as-
sumed to pay a debt due by A., and to guaranty him against any claim on the part of the
United States ; the rest of the property was abandoned in full ownership to B. The act
of compromise recites that A. releases to B. "all rights which he had or may have gene-
rally against the United States, of whatsoever nature, consenting that B. may use them
as he may see fit;" and further that B.' gives to A. a full discharge for the amount paid
by the former to the United States, acknowledging himself satisfied therefor. and " re-
nouncing in favor of A. all the rights he has or may have against him in virtue of his subro-
gation to the rights of the United States." The heirs of B. having subsequently obtained
the passage of an act of Congress by which the amount paid by him was refunded to
them on the ground of its having been illegally collected from their ancestor, but not upon
that of its not having been due, the heirs of A. sued them to recover the property conveyed
to B., or an equivalent in money, in consequence of the heirs of the latter having recovered
from the United States the amount paid by him : *Held*, that the debt due by· A. to the
United States was extinguished by payment, and was unaffected by the act of Congress
and the payment to the heirs of B., the government having no power to revive the debt of
A. without his consent; that, by the payment made by B. to the United States, A. became
the debtor of B., and no longer owed the United States, B. having guarantied him against
all claim on their part, and that by the compromise he was entirely discharged; that, in
consequence of A.'s release from his debt to the United States, there was no failure of the
consideration of the compromise ; *that the heirs of A. cannot be injured, nor can they pro-
fit, by the repayment made by the United States.*
Money paid to a creditor, though paid by one who was not the real debtor, cannot be recov-
ered, where the creditor received no more than was really due to him.

APPEAL from the Fifth District Court of New Orleans, *Buchanan*, J.
Greiner, *Preston* and *H. A. Bullard*, for the plaintiffs. *L. Janin*, *Mor-
phy* and *Simon*, for the appellants. The judgment of the court was pro-
nounced by

EUSTIS, C. J. On the 27th October, 1820, *John Thompson*, of the parish
of St. Landry, conveyed to *Gérard*, and *Hypolite Chrétien*, certain lands and
slaves mentioned in the conveyance, and also all his property, moveable as well
as immovable, and all the debts then due to him, in consideration of $14,806 27,
for which sum the *Chrétiens* had on that day executed a note, secured by mort-
gage, in favor of *John Nicholson*, marshal of the United States, payable in May
then next ensuing, being for a debt due by said *Thompson* to the United States
for taxes, and which the *Chrétiens* had bound themselves to pay in the manner
aforesaid ; and the act provided that they should have the right to hold, possess,
and dispose of said property until said debt with the expenses and costs should
be paid, in which event the sale was to be annulled. The acts of the parties
thus situated by this conveyance gave rise to disputes which resulted in suits,
which after pending several years were terminated by a compromise, made by
a public act on the 14th July, 1825, in the town of Opelousas. By this act a
portion of the property was given back to *Thompson*, the reconveyance of
another portion was stipulated for, a certain judgment against *Thompson* was

assumed by the *Chrétiens*, who warranted *Thompson* against any future claim on the part of the United States, and *Thompson* abandoned to them in full ownership all the rest of the property conveyed to them in the act of October, 1820. The plaintiffs, who are the heirs of *Thompson*, have instituted the present suit against the defendants, who are the heirs of the *Chrétiens*, in which they claim the property embraced in the act of compromise, or an amount in money, in consequence of the *Chrétiens* having received back from the government of the United States the money they had paid for *Thompson*, by reason of which the consideration of the contracts before mentioned completely failed, and the property conveyed reverted of right to its original owner. There was judgment in favor of the plaintiffs for $15,617 80, with interest, and the defendants have appealed.

*Thompson* was collector of the revenue of the United States for the western district of Louisiana, and *Louis Chrétien* was his surety for an amount which is not in evidence. A warrant of distress was issued against him and his surety from the treasury department. *Louis Chrétien* was then dead, and *Gérard* and *Hypolite*, his brothers, had accepted his succession. *Thompson*, being unable to raise money, made with them the agreement of October, 1820. The amount of the note, $14,806 27, was paid to the marshal of the United States. The compromise of July, 1825, must be first considered. It recites that, in order to terminate the differences which have existed between the parties concerning the payment made to the United States by the *Chrétiens*, as heirs of their brother who was *Thompson's* surety, of a debt due by *Thompson*, and declares that he cedes, releases, transfers, &c., "for the benefit and in favor of the said *Chrétiens*, *all kinds of rights which he has had*, or *may have, generally*, against the United States, of whatsoever nature they may be, &c., consenting that they may use them in such manner as they may think fit." "In consequence and in consideration of the above, the said *Chrétiens* give to the said *John Thompson* a full and complete receipt and discharge, as in fact they hereby acquit and discharge him, of the sum of $14,806 27, which the said *Chrétiens*, as heirs of *Louis Chrétien* deceased, who was the surety of *John Thompson*, have paid to the government, and of every other sum which the said *Chrétiens* have paid for the said *J. Thompson;* the said *Chrétians* acknowledging themselves satisfied and reimbursed for the aforesaid payments made by them, by the sales, cessions and transfers before mentioned. And the said *Chrétiens* moreover *renounce to the said Thompson all the rights which they have, or may have against him, in virtue of their subrogation to the rights of the United States* made to them by the government, declaring that they will make no use of the same against *Thompson*, inasmuch as he has entirely discharged himself in respect to them; and furthermore guaranty him against all claims on the part of the government of the United States relating to the object for which their brother was surety of *Thompson*, declaring the whole to have been paid by the proper officer of the law, and limiting their guarantee to the amount of the suretyship of *Louis Chrétien*." *Thompson*, after conveying to the *Chrétiens* formally the property he abandons to them, transfers to them all his rights of whatever description he may have against the United States, being willing that they may make use of them as they may think proper.

The *Chrétiens* had thus paid the debt of *Thompson* and became subrogated to the rights of the United States, and having received payment in property from *Thompson*, they of course gave him a full and complete discharge, and the

THOMPSON
v.
CHRETIEN.

matters between them were thus apparently closed, in 1825. In December of that year the *Chrétiens* applied to Congress for the refunding of the amount they had thus paid, and, on the 3d of March, 1826, an act was passed for the relief of the heirs and representatives of *Louis Chrétien* deceased, by which was ordered to be paid to *Gérard* and *Hypolite Chrétien* as such, the principal sum of $12,999, with interest at six per cent from the 3d of April, 1822, until sixty days after the passage of the act, the said sum having been illegally collected by the marshal of the United States, under a treasury warrant, from the said *Louis Chrétien*, as one of the sureties of *John Thompson*, late collector of direct taxes, &c. This amount had been carried to the credit of *Thompson*, on the books of the treasury, as collector, as the balance of his amount of direct taxes of 1815 and 1816, collected by a distress warrant from *L. Chrétien*, one of his sureties. When *Thompson* heard of this act of Congress he remonstrated against the *Chrétiens* having any right to the receipt of the money, inasmuch as he had paid them, and they had bound themselves to guaranty him against any claim of the government of the United States. A copy of the compromise was also forwarded, but it had no effect, and the *Chrétiens* had the full benefit of the liberality of Congress. They were informed at the time, by the representative in Congress from the district, that they would be bound to restore the property received from *Thompson*, which was afterwards repeated on his return.

It is insisted for the defendants that, under the clause of the compromise which we have quoted, the *Chrétiens* had a right to get this money back from the government of the United States for their sole and exclusive benefit; and this clause has been the subject of much discussion and argument. *Thompson* had a claim against the government for the stamps for which he had been charged by the treasury, and which remained in his hands undisposed of, and also for some unpaid salary as a clerk to the land commissioners, which was afterwards allowed to his heirs. Under a fair construction of the whole act we think, the claims transferred could not be extended beyond these.

The act of Congress relates not to the claim of *Thompson*, but to that of the heirs and representatives of one of his sureties, which were based upon rights appertaining to their own merits and not those of the principal debtor—upon the money having been *illegally collected from L. Chrétien*, and not upon its not having been due. That *Thompson* should consent that this debt which was paid should be uncovered, and the distress warrant be again issued against him, his property seized, his defalcation again gazetted, and he forced to pay a debt twice, or commit a fraud by not paying it, is too improbable to require notice. That provided his debt to the United States remained paid, it, at one time, was a matter of indifference to him, whatever terms the *Chrétiens* might afterwards make with the government, is all that we can feel ourselves permitted to believe under the circumstances.

Before the legal consequences of the failure of the consideration of the compromise are to be considered, there is a question not free from difficulty, and that is, whether the consideration has failed—whether *Thompson's* debt to the United States has not been extinguished by payment, and remains unaffected by the act of Congress and the payment under it to the *Chrétiens*. If such be the case—if it be in fact extinct, what claim the plaintiffs have for the restoration of the property is to be considered. The litigation between these parties and their successors has been of long duration; it commenced more than twenty-

five years ago. The present case was before the Supreme Court in 1842. 3 Robinson, 26. It has been our aim to reach and determine it on the principles of law, from which we are not permitted to deviate for the purpose of relieving parties from difficulties in which their own conduct and conventions have involved them. It is deplorable that the property of a family should have been wrecked as this has been, and we feel deeply the responsibility of terminating forever a case which involves such interests, and of the great hardship of which we are thoroughly convinced.

The debt of *Thompson* was paid by the *Chrétiens* to the government, and *Thompson* afterwards reimbursed them. The *Chrétiens* then received back from the government the amount paid : What effect has this upon the debt of *Thompson?* The statement of the facts brings up the familiar rule that when a debt is once paid, there must be some legal cause upon which a party can be enabled to revive it. It is affected by fraud, error, violence, or any of those causes which affect the validity of all contracts ; but that the creditor can, at his will and by his own act, revive it against the debtor, cannot we think be seriously maintained. The government of the United States of its own free will and accord returned the *Chrétiens* the money, with the exception of a sum retained, which had been paid to the marshal of the United States, and for which they had given their promissory note, which was drawn by *Gérard* and endorsed by *Hypolite Chrétien.* Was the debt against *Thompson* revived by this act, or did it remain unaffected by it ?

So far as the rights of *Thompson* are concerned, this court must look upon the acts of the government of the United States in the same light as they would upon those of an individual. The rights secured to debtors rest exclusively upon the law, and the government as a creditor has no privileges except those which appertain to its functions as recognised and established by law. The debt of *Thompson* having been paid, the government by no act of its own had the power of reviving the obligation of *Thompson*, without his privity or consent. We are at a loss to conceive on what basis any such power can be made to rest.

It is said that the *Chrétiens* paid the government in *error*, and the money paid ought to have been recovered back. But in what did the error of the *Chrétiens* consist ? They well knew the extent of their brother's responsibility on the bond of *Thompson.* They knew that there was another surety besides their brother. They, as two of his heirs, were not bound even for the whole of his responsibility. In point of fact, according to the statements made in the argument of the plaintiffs' counsel, the amount they were liable for was not the sole cause for the interference of the *Chrétiens* in favor of *Thompson*. The two families were connected by marriage. *Thompson's* whole property was under seizure, and a portion of it sold under a distress warrant issued against him as a public defaulter, and advertized for sale, and it was to save him from total ruin, as well as themselves from being called upon to meet any deficiency, that they assumed the whole debt. In their petition against *Thompson*, filed on 1822, it is alleged that they acted from the *charitable motive of saving* him from total ruin, as well as for saving themselves from loss in interfering in his behalf with the marshal of the United States, in arresting the sale of his property.

The government of the United States, in returning the money to the *Chrétiens*, retained only $1,807, for which sum it may be supposed *Gérard* and *Hypolite* were only legally bound as two of the heirs of their brother *Louis.* As if to render the fact of error impossible, they took security for the whole

amount they had bound themselves for, from *Thompson;* and, five pears after-wards, were fully paid by him under the compromise of 1825, and, as subroga-ted to the United States, formally discharged *Thompson* and gave him back part of his property, and assumed and paid a judgment which had been rendered against him. Can it be pretended, in the presence of this array of overwhelming facts, that the *Chrétiens* could claim relief from the government of the United States on the ground of having paid by mistake, when they had the money re-paid to them in their pockets, and had extinguished all the rights of the United States, which, by subrogation, were vested in them, by a formal discharge of *Thompson?* Such a pretension appears to us to rest upon a complete confusion of all ideas of right and wrong.

The *Chrétiens,* as friends of *Thompson* or as strangers, had a right to dis-charge his debt and save his family from being turned out of doors; but, if the debt was really due, they never could recover it back from the creditor who had received no more than he had a right to. Domat, lib. 2, tit. 7, §2. Repe-titio nulla est ab eo qui suum recepit, tametsi ab alio quam vero debitore solu-tum est. L. 44, ff, De Condict. Indebiti. The reason given for this by Do-mat is, that the creditor has received only what was his due, and the person thus interfering may have wished to discharge the debtor. After the debtor shall have paid the person, who has thereupon given him a discharge for the debt, how can the creditor, by returning the money to the person who paid it, bring into existence the debt which has thus been twice extinguished.

This debt we think has been twice paid, once by the *Chrétiens* to the United States, and once by *Thompson* to the *Chrétiens;* and, as matters stand, the United States have no more claim against *Thompson* than the *Chrétiens* would have, had the money not been returned to them. By the payment to the Uni-ted States *Thompson* became the debtor to the *Chrétiens* who made it, and no longer owed the United States; by the compromise of 1825, he was entirely discharged. If *Thompson* was thus released from this debt the consideration of the compromise has not failed, but, on the contrary, he has had the benefit of it, and the compromise remains in force.

It certainly has the appearance of injustice that the plaintiffs should not have the benefit of the money returned to the *Chrétiens* under the act of Congress. But considering that act in relation to the evidence which is before us, we can only view it as a matter between the parties exclusively, and not affecting the rights of *Thompson.* His heirs cannot be injured by it, but they can derive no benefit from it. The error in this matter does not consist in the payment of the *Chrétiens,* but in the reimbursement to them of what they had already re-ceived.

But the United States have sued the plaintiffs on the original cause of action for which the distress warrant was issued, and the plaintiffs have pleaded pay-ment. It appears by the treasury transcript annexed to the petition on which the suit is brought, that the nett proceeds of the payment to the marshal were passed to the credit of *Thompson,* as collector of the revenue. The right of the government to disturb this payment and make *Thompson* again the debtor of the United States we have considered in this case, and we have no reason to think that any court would come to any other conclusion; but we may err in this, and the courts of the United States may take a different view of the sub-ject, and hold the debt to be still unpaid. For this contingency we must provide; and in this respect the rights of the plaintiffs must be fully protected, under the

formal guarantee in favor of *Thompson* in the act of compromise, against all claims on the part of the United States.

We concur with the Supreme Court in the opinion expressed on the former trial of this cause that, the obligation of the *Chrétiens* to *Thompson* was *joint* and not *in solido.*

In closing this cause it is proper to add that, we have considered the very able and elaborate opinion of the judge of the Fifth District Court of New Orleans, the strong equitable views of which we approve, but cannot for the reasons given apply them for the benefit of the plaintiffs.

It is ordered that the judgment appealed from be reversed; and it is further ordered that the defendants, to wit, the representatives of the succession of *Hypolite Chrétien* for one-half, and the representatives of the succession of *Gérard Chrétien* for one-half, be decreed to hold harmless and indemnify the plaintiffs against the said claim of the United States, against them by reason of the reimbursement made to the said *Hypolite* and *Gérard Chrétien*, in pursuance of an act of Congress of March, 1826, and that the appellees pay the costs of appeal, and the defendants those in the court below.